UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Augustin Sajous,<br><br>               Petitioner,<br><br>    –v–<br><br>Thomas Decker et al.,<br><br>               Respondents. | 18-cv-2447 (AJN)<br><br>OPINION AND ORDER |

ALISON J. NATHAN, District Judge:

The present case, initiated by the filing of a petition for habeas corpus under 28 U.S.C. § 2241, concerns the question recently left open by the Supreme Court in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018): whether prolonged mandatory detention of an alien under 8 U.S.C. § 1226(c), without access to a bond hearing, violates the Due Process Clause of the Fifth Amendment. Currently before this Court is the Petitioner's motion for preliminary injunction seeking an order that the Petitioner, who has been detained for over eight months, be given an individualized bond hearing. For the reasons that follow, the Court will grant the Petitioner's motion and order that he receive an individualized bond hearing, thus resolving this case with respect to the individual Petitioner.

## I. Background

### A. Statutory Framework – § 1226(c)

Under federal immigration law, the Department of Homeland Security is authorized to arrest and initially detain an alien who has entered the United States but is believed to be removable. 8 U.S.C. § 1226(a); *Lora v. Shanahan*, 804 F.3d 601, 608-09 (2d Cir. 2015), *vacated*

1

138 S. Ct. 1260 (2018). The alien may be detained "pending a decision on whether the alien is to be removed," or federal officials may choose to release the alien on bond or conditional parole. 8 U.S.C § 1226(a)(1)-(2). Even if officials decide to detain the alien, "an [immigration judge] can ordinarily conduct a bail hearing to decide whether the alien should be released or imprisoned while proceedings are pending." *Lora*, 804 F.3d at 608. Under § 1226(c), however, certain classes of aliens are subject to mandatory detention and may not, under the statute, be released on bond. *Jennings v. Rodriguez*, 138 S. Ct. 830, 837-38 (2018). Broadly speaking, aliens subject to mandatory detention include those who have committed certain "crimes involving moral turpitude" as defined by statute, controlled substance offenses, aggravated felonies, firearm offenses, or terrorist activities. *See* 8 U.S.C. § 1226(c)(1)(A)-(D). An alien who is detained pursuant to § 1226(c) may seek discretionary release from the Head of the Department of Homeland Security if he is a witness, a potential witness, a cooperator, or an immediate family member or close associate of someone who is acting as a witness, potential witness, or cooperator in an investigation into major criminal activity. *Id.* § 1226(c)(2). No other category of discretionary release exists under the statute.

B.    **Judicial Interpretation of § 1226(c)**

1.    *Lora*

In 2015, the Second Circuit decided *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), which held that "in order to avoid the constitutional concerns raised by indefinite detention, an immigrant detained pursuant to section 1226(c) must be afforded a bail hearing before an immigration judge within six months of his or her detention." *Id.* at 616. In deciding the case, the Second Circuit relied primarily on two Supreme Court cases related to the detention of aliens. The first, *Zadvydas v. Davis*, 533 U.S. 678 (2001), applied the canon of constitutional avoidance

2

and held that aliens who had been ordered removed, but for whom "removal is no longer reasonably foreseeable" could not be detained. *Id.* at 699. The Second Circuit in *Lora* interpreted *Zadvydas* as "the Supreme Court signal[ing] its concerns about the constitutionality of a statutory scheme that ostensibly authorized indefinite detention of non-citizens." 804 F.3d at 613. The second case *Lora* relied on, *Demore v. Kim*, 538 U.S. 510 (2003), upheld the constitutionality of § 1226(c)'s mandatory detention, concluding that Congress "may require that [removable aliens detained under § 1226(c)] be detained for the brief period necessary for their removal proceedings." *Id.* at 513. The *Lora* decision described the Supreme Court's decision in *Demore* as "emphasiz[ing] that, for detention under the statute to be reasonable, it must be for a brief period of time." 804 F.3d at 614. The Second Circuit found further support for its conclusion in Justice Kennedy's concurrence in *Demore*, in which he reasoned that "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* (alteration in original) (quoting *Demore*, 538 U.S. at 532-33 (Kennedy, J., concurring)). The Second Circuit concluded that *Zadvydas* and *Demore*, taken together, "clearly establish that mandatory detention under section 1226(c) is permissible, but that there must be some procedural safeguard in place for immigrants detained for months without a hearing." *Id.* As a result, the Second Circuit employed the canon of constitutional avoidance to read "an implicit temporal limitation" in the statute. *Id.*

Having concluded that *some* temporal limitation on mandatory detention was constitutionally necessary, the Second Circuit further held that the appropriate limitation to read into the statute was six months. *Id.* at 614-15. The Second Circuit found support for this

conclusion in *Zadvydas* and *Demore*, reasoning that those cases "suggest that the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention." *Id.* at 615. Specifically, in *Zadvydas*, "the Court held that six months was a 'presumptively reasonable period of detention' in a related context." *Id.* (quoting *Zadvydas*, 533 U.S. at 700-01). In *Demore*, "the Court held that section 1226(c) authorized mandatory detention only for the 'limited period of [the alien's] removal proceedings,'" which, at the time of the Supreme Court's decision, "'last[ed] roughly a month and a half in the vast majority of cases in which [section 1226(c) was] invoked, and about five months in the minority of cases in which the alien cho[se] to appeal.'" *Id.* (alterations in original) (quoting *Demore*, 538 U.S. at 529-31). In contrast, at the time of the *Lora* decision in 2015, "a non-citizen detained under section 1226(c) who contests his or her removal regularly spen[t] many months and sometimes years in detention due to the enormous backlog in immigration proceedings." *Id.* at 605 & n.9.

The Second Circuit further reasoned that a brightline rule was necessary because of "the pervasive inconsistency and confusion exhibited by district courts in this Circuit when asked to apply a reasonableness test on a case-by-case basis." *Id.* at 615. In addition, a six-month rule was appropriate, according to *Lora*, because "endless months of detention, often caused by nothing more than bureaucratic backlog, has real-life consequences for immigrants and their families." *Id.* at 616. As a result, the Second Circuit concluded that an alien detained pursuant to § 1226(c) was entitled to a bail hearing after six months of detention and that the detainee "must be admitted to bail unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community." *Id.*

    **2.**    *Jennings*

From October 2015 through February 2018, *Lora* remained good law, and Immigration and Customs Enforcement ("ICE") officials routinely acquiesced to bail hearings before an immigration judge within six months of detention. Decl. of Andrea Saenz, Dkt. No. 14-6, ¶ 3. On February 27, 2018, the Supreme Court decided *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), in which it held that the Ninth Circuit had erred in applying the canon of constitutional avoidance to § 1226(c), as well as other related provisions of federal immigration law, because the express language of § 1226(c) can only mean "that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute." *Id.* at 846. In other words, the only reasonable interpretation of § 1226(c) "makes clear that detention of aliens within [§ 1226(c)'s] scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* (quoting 8 U.S.C. § 1225(a)). As a result, the Ninth Circuit erred when it interpreted § 1226(c) to contain an implicit six-month limitation on detention absent a bail hearing. The Supreme Court described this interpretation as "textual alchemy" and concluded that "[e]ven if courts were permitted to fashion 6–month time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite." *Id.*

In dissent, Justice Breyer, joined by Justices Ginsburg and Sotomayor, warned that interpreting the statute to foreclose any bond hearing while detained "at the very least would raise 'grave doubts' about the statute's constitutionality." *Id.* at 861 (Breyer, J., dissenting). Specifically, the dissent concluded that the Constitution's "language, its basic purposes, the relevant history, our tradition, and many of the relevant cases" all support the conclusion that a statute "that would deny bail proceedings where detention is prolonged would likely mean that the statute violates [the Fifth Amendment to] the Constitution." *Id.* at 869. In support of this

conclusion, the dissent demonstrated that reasonable bail, and the opportunity for a bail hearing, were considered necessary in a long line of Supreme Court precedent, the law of England before the Founding of the United States, and even in the structure of the U.S. Constitution. *See id.* at 862-69. The majority opinion in *Jennings* took no position on this constitutional analysis, instead simply remanding the case to the Ninth Circuit to address the constitutional issue in the first instance. *Id.* at 851 (majority opinion).

Because the Ninth Circuit's interpretation of § 1226(c) had been identical to the Second Circuit's in *Lora*, the Supreme Court's decision in *Jennings* abrogated *Lora*'s constitutional avoidance holding. And so, on March 5, 2018, the Supreme Court granted certiorari in *Lora*, vacated the Second Circuit's judgment, and remanded the case to the Second Circuit for further consideration in light of *Jennings*. *Shanahan v. Lora*, 138 S. Ct. 1260 (2018). On remand, the Second Circuit dismissed the case as moot because the petitioner, Mr. Lora, had been granted cancellation of removal. *Lora v. Shanahan*, 719 F. App'x 79, 80 (2d Cir. 2018). The question, taken up shortly, is whether this posture requires the Court to treat itself as bound by *Lora*'s constitutional analysis.

### C.    The Petitioner

Augustin Sajous came to the United States from Haiti in 1972 when he was 14 years old. Decl. of Augustin Sajous ("Sajous Decl."), Dkt. No. 27-2, ¶¶ 1, 3; *see also* Decl. of Matthew Zabbia ("Zabbia Decl."), Dkt. No. 39, ¶¶ 4-5. He was admitted as a Lawful Permanent Resident. Sajous Decl. ¶¶ 1, 3; Zabbia Decl. ¶ 5. He was trained as an auto mechanic and worked for 30 years in that field. Sajous Decl. ¶¶ 4-5. Sajous suffers from schizophrenia, which was untreated for many years because he "did not know that the voices [he] was hearing were caused by a mental illness." Sajous Decl. ¶ 9. During this period of untreated mental illness, Sajous

committed numerous low-level, non-violent offenses. Decl. of Jesse Rockoff ("Rockoff Decl."), Dkt. No. 27-3, ¶ 3. He was arrested 16 times between 1994 and 2017. Decl. of Brandon Waterman, Ex. A ("RAP Sheet"), Dkt. No. 37-1. He was convicted of crimes including aggravated unlicensed operation of a motor vehicle, attempted criminal possession of stolen property, attempted criminal possession of a controlled substance, petit larceny, criminal possession of a forged instrument, attempted forgery, and criminal trespass. *See* RAP Sheet. Two of these convictions are relevant to the present case. First, on July 6, 2015, Sajous was convicted of criminal possession of a forged instrument in the third degree in violation of New York Penal Law § 170.20, for which he was sentenced to 30 days in jail. RAP Sheet at 20-21. Second, on August 20, 2015, Sajous was convicted of attempted forgery in the third degree in violation of New York Penal Law § 170.05, for which he was sentenced to 30 days in jail. RAP Sheet at 18-19.

On September 21, 2017, Sajous was arrested by ICE officials while appearing in court and served with a Notice to Appear for removal proceedings. Petition, Dkt. No. 13, ¶ 19. The Notice to Appear charges Sajous as removable under section 237(a)(2)(A)(ii) of the Immigration and Nationality Act as an alien who after admission has been convicted of two or more crimes involving moral turpitude. Petition ¶¶ 17-19; Zabbia Decl. ¶ 12; *see also* 8 U.S.C. § 1227(a)(2)(A)(ii). ICE officials detained Sajous subject to the mandatory detention provision contained in 8 U.S.C. § 1226(c). *See* Decl. of Brandon Waterman, Ex. C ("Custody Notice"), Dkt. No. 37-3. Sajous has remained in ICE custody since his arrest on September 21, 2017, and has been held in the immigration jail at Hudson County Correctional Facility in New Jersey. Sajous Decl. ¶ 2; Zabbia Decl. ¶ 12.

On September 26, 2017, ICE officials filed the Notice to Appear with the immigration court, which commenced Sajous's removal proceedings. Zabbia Decl. ¶ 13. On November 13, 2017, Sajous appeared for his first master calendar hearing before an immigration judge. At that appearance, he indicated that he was not prepared to plead to the Notice to Appear. Zabbia Decl. ¶ 14. The immigration judge adjourned the case to December 6, 2017. Zabbia Decl. ¶ 14.

On November 30, 2017, Sajous filed a motion to terminate his removal proceedings on the grounds that the two forgery convictions described above did not qualify as crimes involving moral turpitude. Zabbia Decl. ¶ 15. ICE officials opposed the motion. Zabbia Decl. ¶ 15. On December 6, 2017, at Sajous's second master calendar hearing, Sajous admitted to the allegations in the Notice to Appear but denied removability. Zabbia Decl. ¶ 16. The immigration judge denied Sajous's motion to terminate and found him removable. Zabbia Decl. ¶ 16. A third master calendar hearing was scheduled for December 27, 2017, at which Sajous could submit applications for relief from removal. Zabbia Decl. ¶ 16.

On December 6, 2017, following the second master calendar hearing, Sajous's counsel submitted a FOIA request to the U.S. Citizenship and Immigration Services ("USCIS") to obtain a complete copy of Sajous's immigration A-file. Rockoff Decl. ¶ 6. On December 20, 2017, USCIS received the FOIA request. Decl. of Jill Eggleston ("Eggleston Decl."), Dkt. No. 41, ¶ 7. That same day, USCIS determined that the A-file was in the custody of ICE's New York branch, and USCIS requested the A-file from ICE to be processed pursuant to Sajous's FOIA request. Eggleston Decl. ¶ 8. On January 9, 2018, ICE forwarded the file to USCIS data entry personnel in New York. Decl. of Michael McFarland ("McFarland Decl."), Dkt. No. 40, ¶¶ 4-5. A USCIS contractor received the file on January 23, 2018. McFarland Decl. ¶ 5. However, the A-file was

never forwarded from USCIS personnel in New York to the records processing center in Missouri and was never sent to Sajous. *See* McFarland Decl. ¶¶ 5-7.

On December 27, 2017, Sajous appeared for a third master calendar hearing before the immigration judge. Zabbia Decl. ¶ 17. Sajous's counsel stated that he could not file applications for relief at that hearing because ICE had not yet sent Sajous's A-file. Zabbia Decl. ¶ 17. ICE stated at the hearing that a FOIA request was the appropriate method for obtaining documents from the A-file. Zabbia Decl. ¶ 17. The immigration judge adjourned the case to February 20, 2018. Zabbia Decl. ¶ 17. On January 9, 2018, ICE provided Sajous's counsel with certain documents from a prior removal proceeding that occurred in 2008, at which an immigration judge ultimately terminated the removal proceedings without prejudice on ICE's motion. Zabbia Decl. ¶¶ 9, 18.

On February 20, 2018, Sajous appeared before the immigration judge without counsel for a fourth master calendar hearing and *Lora* bond hearing. Zabbia Decl. ¶ 19. However, the hearings did not proceed because although the hearing had been scheduled for the morning, the hearing notice provided to Sajous and his counsel stated that the hearing was scheduled for the afternoon docket. Zabbia Decl. ¶ 19. The immigration judge rescheduled the hearings for March 19, 2018. Zabbia Decl. ¶ 19.

On March 19, 2018, Sajous and his attorney appeared for the adjourned fourth master calendar hearing, at which Sajous's counsel filed two applications for relief from removal. Zabbia Decl. ¶ 20. Sajous's counsel informed the immigration judge that he had not yet received the complete copy of Sajous's A-file pursuant to the December 6, 2017 FOIA request. Zabbia Decl. ¶ 20. Over ICE's objection, the immigration judge adjourned the case to May 1, 2018 for a fifth master calendar hearing. Zabbia Decl. ¶ 20. The immigration judge further concluded that

he could not hold a *Lora* bond hearing because Sajous was subject to mandatory detention under § 1226(c), and *Lora* had been vacated by the Supreme Court following its decision in *Jennings*. Zabbia Decl. ¶ 20.

Following the March 19, 2018 master calendar hearing, Sajous's counsel filed an initial habeas petition with this Court. Dkt. No. 1. On March 20, 2018, after learning that Sajous had filed a habeas petition, ICE Deputy Chief Counsel Michael McFarland instructed an ICE clerk to obtain Sajous's A-file, which ICE knew through electronic records was still located at USCIS offices in New York. McFarland Decl. ¶ 6. On March 22, 2018, an ICE clerk retrieved the file, and ICE became aware that USCIS had never delivered the A-file to the records department in Missouri for FOIA processing. McFarland Decl. ¶ 7. On March 29, 2018, ICE once again forwarded the A-file to USCIS data personnel in New York. McFarland Decl. ¶ 8. Also on March 29, 2018, USCIS personnel forwarded the file to the records department in Missouri. The file was received in Missouri on or before April 6, 2018. McFarland Decl. ¶ 8. USCIS sent the processed A-file to ICE's FOIA Office on April 16, 2018. Eggleston Decl. ¶ 9.

On April 5, 2018, Sajous filed an amended petition with this Court. *See* Petition. He simultaneously filed a motion to certify a class of similarly situated plaintiffs, Dkt. No. 14, and shortly thereafter filed a motion for preliminary injunction ordering that he be granted a bond hearing, Dkt. No. 27. On May 18, 2018, the Court heard oral argument in this matter.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. As a general matter, a party seeking a preliminary injunction must make one of two showings: First,

he may "show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, he "may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)). When a party seeks a preliminary injunction that "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant bears a more substantial burden and "must show 'clear' or 'substantial' likelihood of success on the merits and make a 'strong showing' of irreparable harm in addition to showing that the preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citations omitted).

## III. Petitioner Sajous Is Entitled to a Preliminary Injunction

The Court concludes that the Petitioner has demonstrated that he is entitled to a preliminary injunction. Based on the circumstances of his case, he has made a clear and substantial showing that he will prevail on the merits. Additionally, the continued deprivation of his freedom from detention without due process constitutes irreparable harm. Finally, the balance of equities and public interest tip decidedly in his favor because the continued deprivation of his liberty outweighs the boilerplate suggestion that granting Sajous a hearing undermines the immigration laws of the United States.

### A. Likelihood of Success on the Merits

There is a clear and substantial likelihood that the Petitioner will succeed on the merits. In fact, the Court concludes that the Petitioner does succeed on the merits in this case. Applying existing case law, the Court first concludes that under the Due Process Clause, the reasonability of detention under § 1226(c) is an individualized inquiry. Considering the particular circumstances of this case, the Court next concludes that it would violate the Petitioner's right to due process to continue to detain him without prompt access to an individualized bond hearing. As a result, Sajous is substantially likely to succeed (and does, in fact succeed) on the merits.

### 1. Effect of *Lora*

The first question the Court must answer is whether the Second Circuit's constitutional analysis in *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), *vacated* 138 S. Ct. 1260 (2018), remains binding authority that the Court must follow. Petitioner argues that *Lora* remains precedential despite the Supreme Court's grant, vacatur, and remand of the judgment in that case, relying primarily on a decision of the D.C. Circuit. *See* Memo. in Support of Mot. for Prelim. Injunction ("Support"), Dkt. No. 27-1, at 7 n.2 ("When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding continue[s] to have precedential weight, and in the absence of contrary authority, we do not disturb it." (alteration in original) (quoting *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006)). The Government, on the other hand, argues that "[t]he Court's holding in *Jennings* . . . abrogates *Lora*'s prolonged detention holding." Memo. in Opp. to Mot. for Prelim. Injunction ("Opp."), Dkt. No. 36, at 11.

As a preliminary matter, it is worth noting that by definition, vacating a decision divests that decision of legal force. *Vacate*, Black's Law Dictionary (10th ed. 2014) (defining "vacate" as "[t]o nullify or cancel; make void; invalidate"). Moreover, the Court concludes that under the

Second Circuit's case law, the opinion in *Lora* is no longer binding but carries significant persuasive weight. In *Brown v. Kelly*, 609 F.3d 467, 476-77 (2d Cir. 2010), the Second Circuit stated that following the Supreme Court's vacatur of a prior Second Circuit decision, the *Brown* panel was no longer bound to follow the Circuit's prior precedent. Specifically, it reasoned that "[b]ecause the Supreme Court vacated" the Second Circuit's prior decision, that prior decision "is not technically binding on us." *Id.* at 476. In so stating, the Second Circuit relied on its analysis in a previous case, in which it had written in dicta that "[w]hen imposed by the Supreme Court, vacatur eliminates an appellate precedent that would otherwise control decision on a contested question throughout the circuit." *Id.* at 477 (alteration in original) (quoting *Russman v. Bd. of Educ. of the Enlarged City Sch. Dist. of the City of Watervliet*, 260 F.3d 114, 122 n.2 (2d Cir. 2001)). The Second Circuit further noted, however, that it should "nonetheless treat [the vacated decision] as persuasive authority." *Id.*

Courts in this district, following the Second Circuit's conclusion in *Brown*, have treated vacated Second Circuit opinions as persuasive – but nonbinding – authority. *See Silverman v. Miranda*, 213 F. Supp. 3d 519, 530 (S.D.N.Y. 2016) ("Although *Miranda III* is no longer binding on this Court, it was vacated on grounds unrelated to damages, and the Court treats the decision as persuasive authority as to those issues."); *United Nat'l Ins. Co. v. Waterfront N.Y. Realty, Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996) ("Because the Second Circuit's decision in *United National v. Waterfront* was vacated on jurisdictional grounds, it is not controlling precedent. Nonetheless, as the decision was not vacated on the merits, it remains strong persuasive authority." (citation omitted)).[1] The Court will do the same here. The Government

---

[1] The Court recognizes that in *Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 550 (S.D.N.Y. 2011), *rev'd*, 726 F.3d 290 (2d Cir. 2013), the court concluded that a Second Circuit decision "continue[d] to have precedential effect notwithstanding the issuance of" the Supreme Court's order granting certiorari, vacating the

13

notes that this language in *Brown* may be dicta rather than a holding. *See* Dkt. No. 61. Neither the Petitioner, Dkt. No. 63, nor the Government suggests, however, that this Court should disregard the *Brown* language on vacatur, and this Court sees no basis for doing so.

The Second Circuit cases cited by the Petitioner do not compel a contrary result. First, Petitioner cites *Wojchowski v. Daines*, 498 F.3d 99 (2d Cir. 2007). *See* Support at 11. There, the Second Circuit, in laying out the general rule that previously decided opinions of one panel bind all other future panels, recognized an exception when "an intervening Supreme Court decision . . . casts doubt on our controlling precedent." 498 F.3d at 106 (quoting *Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006)). But *Wojchowski* does not speak to the context in which the Supreme Court has directly vacated a Circuit decision. Second, Petitioner's reliance on *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33 (2d Cir. 1993), is unavailing. *See* Reply at 2 n.1. There, the Second Circuit considered its own ability to reach the same conclusion as it had previously reached in a case in which the Supreme Court had granted certiorari, vacated the decision, and remanded. 999 F.2d at 35 n.1. The Court agrees that the Second Circuit can – and may very well – reach the same conclusion as it did in *Lora* in a subsequent case. That proposition, however, does not suggest that this Court is bound by the now-vacated decision in *Lora*, or its reasoning, and can thus apply the rule of that decision without independent analysis.

At oral argument, the Petitioner contended that the Second Circuit has implicitly signaled the continuing authority of *Lora*. This argument was premised on the fact that when the Second Circuit dismissed *Lora* as moot on remand from the Supreme Court, it did not cite the *Munsingwear* doctrine or "vacat[e] the panel decision." Tr. of May 18, 2018 Oral Argument

---

judgment, and remanding. However, because that decision is incompatible with the Second Circuit's clear admonition in *Brown*, the Court does not find that case persuasive here.

("Tr.") 4:10-5:24; *see also Lora v. Shanahan*, 719 F. App'x 79 (2d Cir. 2018) (dismissing the appeal as moot); Letter Brief of Appellant Lora at 4-5, 719 F. App'x 79 (2d Cir. 2018) (No. 14-2343), Dkt. No. 182 (requesting the original panel decision be vacated pursuant to the *Munsingwear* doctrine). Under *Munsingwear*, if a case becomes moot before it can be fully litigated on appeal, the reviewing court's "decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear*, 340 U.S. 36, 40 (1950). This ensures that "the rights of all parties are preserved" to fully litigate the issues in a future case. *Id.* In this case, the Petitioner argues that because the appellant in *Lora* requested that the Second Circuit vacate the panel decision under the *Munsingwear* doctrine following the Supreme Court's vacatur and remand, and because the Second Circuit did not cite the doctrine or vacate the panel decision when it dismissed the *Lora* case as moot, the Second Circuit intended that its prior decision remain in effect. This argument is not persuasive. The Supreme Court had already vacated the *Lora* panel opinion before remanding it to the Second Circuit. *See* 719 F. App'x at 80. There was thus no precedential decision left for the Second Circuit to vacate on remand under *Munsingwear* before it dismissed the appeal as moot. And so, as the Government concedes in its May 23, 2018 letter, all of *Lora*'s holdings are, at most, merely persuasive authority. *See* Dkt. No. 61.

The Court thus concludes that the entirety of the Second Circuit's decision in *Lora* is no longer binding authority. Nevertheless, consistent with the Second Circuit's decision in *Brown*, the reasoning of *Lora* remains strong persuasive authority to guide the decision in this case.

## 2. Due Process Claim

Having concluded that the decision in *Lora* is not binding authority that neatly resolves this case, the Court must decide whether the Petitioner is likely to succeed on his claim that his

detention of longer than six months without a bond hearing violates the Fifth Amendment's due process guarantee. The Court concludes that the particular circumstances surrounding the Petitioner's detention make the duration for which he has been held without a bond hearing unreasonable, and he is therefore likely to succeed on the merits of his claim.

### a. Prolonged Detention Without a Bond Hearing Violates the Fifth Amendment

The Court's first conclusion is essentially conceded by the Government: that prolonged detention under § 1226(c) without providing an alien with a bond hearing will – at some point – violate the right to due process.

"Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. This liberty interest applies equally to aliens present within the United States. The Supreme Court has repeatedly recognized that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693; *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *Demore*, 538 U.S. at 523 (same). As a result, the Supreme Court concluded in *Zadvydas* that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem" under the Fifth Amendment. 533 U.S. at 690.

Furthermore, in *Demore*, the Supreme Court held that mandatory detention under § 1226(c) was not unconstitutional on its face, but limited its holding to a brief period of detention, stating "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for *the brief period* necessary

for their removal proceedings." 538 U.S. at 513 (emphasis added). The Court described the "brief period" that it held valid: "in the majority of cases," detention pursuant to § 1226(c) in 2003 "lasts for less than . . . 90 days." *Id.* at 529. In the overwhelming majority of cases – 85% – "removal proceedings are completed in an average time of 47 days and a median of 30 days." *Id.* "In the remaining 15% of cases," in which an appeal was taken, "appeal takes an average of four months." *Id.* The Court thus concluded that "[i]n sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases." *Id.* at 530. Throughout the opinion, the Supreme Court emphasized the brevity of detention under § 1226(c). *See id.* at 522-23 ("Rather, respondent argued that the Government may not, consistent with the Due Process Clause of the Fifth Amendment, detain him for the *brief* period necessary for his removal proceedings." (emphasis added)); *id.* at 526 ("Despite this Court's longstanding view that the Government may constitutionally detain deportable aliens during the *limited* period necessary for their removal proceedings, respondent argues that the narrow detention policy reflected in 8 U.S.C. § 1226(c) violates due process." (emphasis added)); *id.* at 528 ("*Zadvydas* is materially different from the present case in a second respect as well. While the period of detention at issue in *Zadvydas* was 'indefinite' and 'potentially permanent,' the detention here is of a *much shorter duration*." (emphasis added) (citation omitted)); *id.* at 531 ("The INS detention of respondent, a criminal alien who has conceded that he is deportable, for the *limited* period of his removal proceedings, is governed by these cases." (emphasis added)). Justice Kennedy's concurring opinion identified the duration of detention as dispositive of the Court's holding, reasoning that "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to

protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532-33 (Kennedy, J., concurring). Under those circumstances, "a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness." *Id.* at 532.

As a result, the Second Circuit in *Lora* concluded that mandatory detention under § 1226(c) could become so prolonged that it would violate the right to due process, as suggested in Justice Kennedy's *Demore* concurrence. *See Lora*, 804 F.3d at 614 ("[M]andatory detention under section 1226(c) is permissible, but . . . there must be some procedural safeguard in place for immigrants detained for months without a hearing."). In so ruling, the Second Circuit "join[ed] every other circuit that has considered this issue." *Id.*; *see Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199, 1213 (11th Cir. 2016) ("ICE's continuous mandatory detention of Sopo without a bond hearing has lasted for four years, including through two BIA remands to the IJ, and patently raises serious constitutional concerns."), *vacated,* No. 14-11421, 2018 WL 2247336, at *1 (11th Cir. May 17, 2018); *Reid v. Donelan*, 819 F.3d 486, 494 (1st Cir. 2016) ("The concept of a categorical, mandatory, and indeterminate detention raises severe constitutional concerns."); *Rodriguez v. Robbins*, 715 F.3d 1127, 1137 (9th Cir. 2013) ("[I]t is clear that while mandatory detention under § 1226(c) is not constitutionally impermissible *per se*, the statute cannot be read to authorize mandatory detention of criminal aliens with no limit on the duration of imprisonment."); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 232 (3d Cir. 2011) ("At a certain point, continued detention becomes unreasonable and the Executive Branch's implementation of § 1226(c) becomes unconstitutional unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community."); *Ly v. Hansen*, 351 F.3d 263, 270 (6th Cir. 2003) (holding

that the Constitution would require "that removal proceedings be concluded within a reasonable time"). *Lora*'s constitutional analysis also echoed the decisions of courts within this district that had reached the constitutional issue rather than applying the doctrine of constitutional avoidance. *See, e.g.*, *Young v. Aviles*, 99 F. Supp. 3d 443, 455 (S.D.N.Y. 2015) ("[T]his Court agrees with those that have found that, at some point, detention without a hearing offends the Due Process Clause."); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 548 (S.D.N.Y. 2014) ("Six months' detention without an opportunity to be heard raises serious constitutional questions.").

The Government in this case similarly conceded at oral argument that, although the language of § 1226 technically ascribes an end point to all detention under the section by authorizing detention only until "a decision on whether the alien is to be removed" is reached, 8 U.S.C. § 1226(a), such detention in reality could, for some detained aliens, become potentially indefinite. Tr. 48:21-49:19. In such cases, the Government recognized, aliens must have a remedy to redress such unreasonable detention through an as-applied challenge to continued detention. Tr. 36:19-37:2, 48:13-14, 48:21-49:19.

The Court likewise concludes based on the text of the Fifth Amendment, the Supreme Court's decisions in *Zadvydas* and *Demore*, as well as the persuasive interpretation of these cases offered by other federal courts and the Government's concessions in this case, that prolonged mandatory detention under § 1226(c), under certain circumstances discussed below, can become unreasonable such that an alien is "entitled to an individualized determination as to his risk of flight and dangerousness." *Demore*, 538 U.S. at 532 (Kennedy, J., concurring).

### b.     A Brightline Rule of a Bond Hearing after Six Months Is Not Constitutionally Mandated

While the Court adopts the holding of *Lora* that the Fifth Amendment requires aliens to be afforded bail hearings if detained for a prolonged period, the Court cannot conclude – as

either a matter of first impression or in reliance on *Lora*'s analysis – that the Constitution would deem any detention beyond six months per se unconstitutional. The Second Circuit in *Lora* adopted a six-month brightline rule as a matter of statutory interpretation, and it is not clear from the opinion in that case whether the six-month rule can be disaggregated from the court's constitutional avoidance analysis. In reaching a brightline rule, the Second Circuit largely relied on practical concerns such as the predictability of district court decisions that, while useful when choosing among alternative statutory constructions, have no obvious significance under a due process analysis engaged in by a district court. *See Lora*, 804 F.3d at 616 ("With such large dockets, predictability and certainty are considerations of enhanced importance and we believe that the interests of the detainees and the district courts, as well as the government, are best served by this approach."). Because the Second Circuit's opinion provides no guidance on the brightline question outside of the constitutional-avoidance mode, the Court is not persuaded that the six-month brightline rule adopted in *Lora* is applicable when considering the constitutional question at issue before this Court and in this case. The Court also finds reason to doubt that the Due Process Clause requires a six-month brightline rule for bail hearings based on the *Demore* decision. There, the Supreme Court upheld the mandatory detention of an alien who had already been detained for six months and would continue to be detained following remand of the case. The Court reasoned that the alien in that case "was detained for somewhat longer than the average – spending six months in INS custody prior to the District Court's order granting habeas relief, but respondent himself had requested a continuance of his removal hearing," thus justifying his somewhat longer detention. *Demore*, 538 U.S. at 530-31.

Because *Lora* analyzed its six-month brightline rule only as a matter of statutory construction and because it is uncertain, based on existing precedent, whether the Due Process

Clause mandates such a brightline rule, the Court concludes that it may not impose a six-month rule as a matter of constitutional interpretation.

### c. Whether Detention Is "Unreasonable" Requires a Case-Specific Analysis

Rather than employ a brightline rule, the Court concludes that whether mandatory detention under § 1226(c) has become "unreasonable," *Demore*, 538 U.S. at 532 (Kennedy, J., concurring), and thus a due process violation, must be decided using an as-applied, fact-based analysis. "Reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all the circumstances of any given case." *Diop*, 656 F.3d at 234. Such an analysis will require examining several factors that have been derived from the Supreme Court's decisions in *Zadvydas* and *Demore* and adopted by courts in this circuit and elsewhere when determining whether an alien's detention has become unreasonable.

The first, and most important, factor that must be considered is the length of time the alien has already been detained. In *Zadvydas*, the Court identified six months of detention as presumptively reasonable. 533 U.S. at 701. Conversely, it noted "that Congress previously doubted the constitutionality of detention for more than six months." *Id.* (citing *United States v. Witkovich*, 353 U.S. 194 (1957)). As a result, detention that has lasted longer than six months is more likely to be "unreasonable," and thus contrary to due process, than detention of less than six months. *See Sopo*, 825 F.3d at 1217 ("The need for a bond inquiry is likely to arise in the six-month to one-year window, at which time a court must determine whether the purposes of the statute – preventing flight and criminal acts – are being fulfilled, and whether the government is incarcerating the alien for reasons other than risk of flight or dangerousness."); *Diop*, 656 F.3d at 234 ("[G]iven that Congress and the Supreme Court believed those purposes [of § 1226(c)] would be fulfilled in the vast majority of cases within a month and a half, and five months at the

maximum, the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds." (citation omitted)); *Araujo-Cortes*, 35 F. Supp. 3d at 548 ("[I]t is longer than the six-months after which detention becomes prolonged and presumptively unreasonable under *Zadvydas*."). As part of this analysis, the likely duration of continued detention is pertinent. *See Reid*, 819 F.3d at 500; *Araujo-Cortes*, 35 F. Supp. 3d at 549.

Second, courts should consider whether the alien is responsible for the delay. If the alien has requested several continuances or otherwise delayed immigration proceedings, it is less likely that the length of his detention could be deemed unreasonable because "aliens who are merely gaming the system to delay their removal should not be rewarded with a bond hearing that they would not otherwise get under the statute." *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 476 (3d Cir. 2015); *Ly*, 351 F.3d at 272 ("[C]ourts must be sensitive to the possibility that dilatory tactics by the removable alien may serve . . . to compel a determination that the alien must be released because of the length of his incarceration."); *see also Demore*, 538 U.S. at 531 (justifying the alien's six-month detention by stating that "respondent himself had requested a continuance"). If immigration officials have caused delay, it weighs in favor of finding continued detention unreasonable. *See Demore*, 538 U.S. at 532-33 (Kennedy, J., concurring) ("Were there to be an unreasonable delay *by the INS* in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." (emphasis added)); *Reid*, 819 F.3d at 500 (considering "the promptness (or delay) of the immigration authorities" as a relevant factor); *Young*, 99 F. Supp. 3d at 455-56 (holding that an alien's detention did not yet violate due process because, "[f]irst and foremost,

22

'[t]here is no evidence that the immigration authorities have unreasonably prolonged [Young's] removal proceedings and consequent detention.'" (second and third alteration in original) (citation omitted)).

Continued detention will also appear more unreasonable when the delay in proceedings was caused by the immigration court or other non-ICE government officials. The Court thus rejects the Government's position at oral argument that "the Court's focus should be on ICE's action as the prosecuting agency" and that if "the immigration court just sits on [an alien's case] either because of capacity or negligence or something," that should not be considered. Tr. 30:4-31:16, 40:16-18. When an alien's detention becomes prolonged because his case has "slipped through the cracks," such detention is unreasonable whether the failure was caused by ICE officials, an immigration judge, an administrative clerk, or another agency such as USCIS. As the Sixth Circuit concluded in *Ly*, "although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take." 351 F.3d at 272. The *Ly* opinion criticizes the immigration court for taking "a year and a half with no final decision as to removability in this case," concluding that such delay was unreasonable. *Id.* at 271. The Court finds this reasoning persuasive and agrees that the operative question should be whether the alien has been the cause of delayed immigration proceedings and, where the fault is attributable to some entity other than the alien, the factor will weigh in favor of concluding that continued detention without a bond hearing is unreasonable.

Third, it may be pertinent whether the detained alien has asserted defenses to removal. If an alien has not asserted any grounds on which his removal may be cancelled, he will presumably be removed from the United States eventually. Under these circumstances, detaining the alien will always at least marginally serve "the ultimate purpose behind the detention," and

the continued detention of the alien will be more reasonable than if the alien had at least some possibility of remaining in the country. *See Demore*, 538 U.S. at 531 (Kennedy, J., concurring) ("[T]he ultimate purpose behind the detention is premised upon the alien's deportability."). Conversely, because the mandatory detention statute "is premised upon the alien's *presumed* deportability and the government's *presumed* ability to reach the removal decision within a brief period of time," as "the actualization of these presumptions grows weaker or more attenuated, the categorical nature of the detention will become increasingly unreasonable." *Reid*, 819 F.3d at 499-500.

Other factors may also be relevant, including "whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable," *Sopo*, 825 F.3d at 1218; *Reid*, 819 F.3d at 500, and "whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention," *Sopo*, 825 F.3d at 1218; *Chavez-Alvarez*, 783 F.3d at 478.

### d. Due Process Requires that the Petitioner Be Given an Immediate Bond Hearing

Applying the factors identified above, the Court concludes that continued detention of the Petitioner pursuant to § 1226(c) without access to a bond hearing is unreasonable, and thus unconstitutional, as applied to him. The Petitioner in this case has already been in detention for longer than eight months. Moreover, the reason why the Petitioner's removal proceedings have been delayed is largely attributable to immigration officials' failure to process and send Sajous's A-file to his counsel. The Petitioner's counsel sent a FOIA request for his complete A-file on December 6, 2017. Rockoff Decl. ¶ 6. After that file was sent to USCIS here in New York, it languished for months, forgotten. *See* McFarland Decl. ¶¶ 5, 7. Despite counsel for Petitioner repeatedly asking about the status of the A-file and representing that he had not received it,

Rockoff Decl. ¶¶ 7-10, 13, 15, no action was taken by ICE or USCIS to confirm that it had been processed and would be sent to the Petitioner. Tr. 32:2-34:3. It was only the filing of this habeas petition that caused the error to be discovered, and only because ICE itself sought to have the A-file returned to its offices. As the Government stated at oral argument, had the Petitioner not had reason to believe that he was entitled to a bond hearing after six months and thus filed a habeas petition, it is possible that USCIS's error would not have been discovered, and the Petitioner could have remained in detention, seeking continuances while awaiting a critical file that was substantially delayed or not coming. Tr. 33:22-34:10. The Court squarely rejects Government's assertion that Sajous is responsible for the delay in his proceedings because he sought a continuance. Opp. at 20-21. The Petitioner was required to seek a continuance *because* of a prolonged, uncorrected failure by the relevant immigration agencies. Principles of logic and fairness prevent the Court from attributing such a delay to the Petitioner. In addition, the Petitioner has asserted several defenses to his removal. The Court need not inquire into the strength of these defenses – it is sufficient to note their existence and the resulting possibility that the Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the Petitioner pending a final determination as to whether he is removable. Moreover, as both parties conceded at oral argument, the Government has not argued – either in immigration proceedings or before this Court – that the defenses raised by Sajous are frivolous. Tr. 22:21-23:5, 38:6-12. It is also relevant that the Petitioner has been detained for over eight months for two offenses that were each punishable by up to 30 days in jail. As a result, his detention under § 1226(c) has already been over four times longer than the maximum sentence he faced for his underlying offenses. Finally, the Petitioner is now being detained in an actual jail.

Simply put, the factors identified above all demonstrate that continued detention of the Petitioner without a bond hearing is unreasonable and unconstitutional. As a result, the Petitioner has demonstrated a substantial likelihood of success on the merits of his petition, and he is thus entitled to an individualized bond hearing, which provides full relief on his claim.

      **e.**      **The Burden of Proof at the Petitioner's Bond Hearing Will Be on the Government**

In his memorandum in support of the motion for a preliminary injunction, the Petitioner argues that the burden at a bond hearing should be on the Government to justify by clear and convincing evidence that Sajous poses a risk of flight or a danger to the community. Support at 14-15. In support of this proposition, he identifies numerous cases in which the Supreme Court has placed the burden on the Government to justify civil detention or the deprivation of other constitutional rights by making a showing of at least clear and convincing evidence. *See id.* (citing *Zadvydas,* 533 U.S. at 692; *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992); *United States v. Salerno,* 481 U.S. 739, 741 (1987); *Kansas v. Hendricks,* 521 U.S. 346, 364 (1997); *Addington v. Texas,* 441 U.S. 418, 424 (1979); *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *Woodby v. I.N.S.*, 385 U.S. 276, 285-286 (1966); and *Chaunt v. United States*, 364 U.S. 350, 353 (1960)). In its opposition, the Government makes no argument regarding which party should bear the burden, or what standard of proof should govern, at a bond hearing. As a result, the Government has "waived this argument by failing to raise it in opposition to plaintiffs' motion." *NML Capital, Ltd. v. Republic of Argentina*, No. 05-cv-2434 (TPG), 2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009); *see also Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation omitted)); *Kao v. British Airways, PLC*, No. 17-

cv-0232 (LGS), 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue.").

Nonetheless, at oral argument, in response to a question from the Court, the Government argued that "to the extent the bond hearing is required, the bond procedures under 1226(a) that placed the burden on the alien should control here." Tr. 42:3-5. The Government provided no support or authority for the proposition that the appropriate way for the Court to resolve what the Constitution requires regarding the burden and showing in a bond hearing would be to graft the standard from a separate statutory provision onto § 1226(c). Because the Government waived any argument regarding who bears the burden and what showing must be made at a bond hearing, and because the untimely argument advanced at oral argument is unsupported by precedent and is otherwise not persuasive, the Court concludes that at the Petitioner's bond hearing, the Government must justify Sajous's continued detention by proving by clear and convincing evidence that he is a flight risk or danger to the community. *Cf.* Memo. & Order, *Pensamiento v. McDonald*, No. 18-10475 (D. Mass. May 21, 2018).

### B.  Irreparable Harm

The Petitioner has made a strong showing that he will suffer irreparable harm unless he is granted an immediate bond hearing. If, as here, a party alleges a violation of a constitutional right, a presumption of irreparable harm attaches. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Several courts in this circuit have concluded that "[t]he deprivation of [an alien's] liberty is, in and of itself, irreparable harm." *Peralta-Veras v. Ashcroft*, No. CV 02-1840 (IRR), 2002 WL 1267998, at *6 (E.D.N.Y. Mar. 29, 2002); *see also Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) ("Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore

constitute quintessential irreparable harm."); *Lynch v. Campbell*, No. 96-cv-0127 (RSP/DRH), 1997 WL 18141, at *2 (N.D.N.Y. Jan. 15, 1997) ("[D]eprivation of liberty due to unnecessary incarceration 'clearly constitutes irreparable harm[.]'" (quoting *United States v. Bole*, 855 F.2d 707, 710-11 (11th Cir. 1988))).

Here, the Petitioner has alleged that he is being deprived of his liberty without due process of law by being detained by ICE for over eight months without having a bond hearing. Moreover, as explained above, he has demonstrated that he is substantially likely to succeed on the merits. Thus, he has made an adequately strong showing that he will suffer irreparable harm absent a preliminary injunction.

Because the Petitioner has made a strong showing of irreparable harm because of his deprivation of a constitutionally protected right, the Court need not consider his alternative argument that he will suffer other irreparable injuries, including ongoing pain from his worsening back condition, inability to develop a long-term plan to address his mental health needs, interference with his ability to return to work, loss of rent-assisted housing and a return to homelessness, or his inability to fully participate in his own removal proceedings. *See* Support at 6-7.

## C.     Balance of the Equities and Public Interest

The Petitioner has also demonstrated that the balance of equities and public interest tip decidedly in his favor. As discussed above, the Petitioner is experiencing a deprivation of liberty without due process of law. The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government. *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984). The Petitioner is also

exposed to the risk that if he is allowed to remain in the United States, he will have lost his access to housing and his employment. He has suffered (and alleges that he will continue to suffer) adverse effects on his health – namely, the exacerbation of a back injury – and is being prevented from creating a long-term plan to deal with his substantial mental health issues.

The Government, on the other hand, is unlikely to suffer any harm from the granting of this preliminary injunction. There is nothing in the record to suggest that granting a bond hearing to the Petitioner will strain ICE resources or undermine its effective enforcement of the immigration laws. Such a hearing, of course, does not mean that the Petitioner will be released – it requires only that he be given a right to demonstrate that he is not a flight risk or danger and thus is entitled to be released on bond pending a determination of removability. *See Lora*, 804 F.3d at 616; *Sopo*, 825 F.3d at 1223. Indeed, the bond hearing that the Petitioner will receive is exactly what he would have received on February 20, 2018 but for a clerical error by the clerk of the immigration court in scheduling his hearing, Zabbia Decl. ¶¶ 17, 19, and it is exactly what *all* aliens detained pursuant to § 1226(c) received as a matter of course between late 2015 and early 2018 when *Lora* was controlling precedent in this circuit. There is no argument in the Government's brief that under that system, ICE was thwarted from effectively enforcing U.S. immigration laws, or that public safety was put at risk. As a result, the balance of equities tips decidedly in the Petitioner's favor.

Likewise, the public interest is best served by granting Petitioner's motion for a preliminary injunction. The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld. *See Mitchell*, 748 F.2d at 808; *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled in part by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc); *Abdi v. Duke*, 280 F. Supp. 3d 373, 410

(W.D.N.Y. 2017). And, in light of the minimal burden placed on ICE as a result of this decision, the Court cannot conclude, as the Government argues, that the public interest in "the government's enforcement of its laws and regulations" outweighs its interest in ensuring that the guarantees of the Constitution are enforced. The Court thus concludes that the balance of equities and the public interest weigh heavily in favor of granting a preliminary injunction.

For all of the foregoing reasons, the Petitioner has carried his burden of demonstrating that he is entitled to a preliminary injunction. Because the Court will order that the Petitioner be granted a bond hearing, the Petitioner has thus received the complete relief that he has sought in this action, thus resolving this case as to the individual Petitioner. Tr. 51:4-52:6, 58:10-18, 59:23-60:1.

## IV.    Conclusion

The motion for a preliminary injunction is granted. The Respondents shall take Augustin Sajous before an immigration judge within fourteen days of this order for an individualized bond hearing, or else they must immediately release Sajous. At the bond hearing, the Petitioner must be released on bail unless the Government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community. This resolves docket number 27.

Within seven days of this Opinion and Order, the parties shall submit a revised schedule for the briefing of the motion to certify a class and motion for a classwide preliminary injunction so that the parties may incorporate the effect of this decision into their discussion of those motions.

SO ORDERED.

Dated: May 23 , 2018
New York, New York

ALISON J. NATHAN
United States District Judge

31